UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kathleen O'Leary,

    Plaintiff,

v.

Oakwood Healthcare, Inc.,

    Defendant.
_____/

Case No. 11-11799

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

This matter comes before the Court on Defendant Oakwood Healthcare, Inc.'s motion for summary judgment. This case involves Plaintiff Kathleen O'Leary's claim that as a staff nurse working for Defendant, she was subjected to unlawful discrimination because of her age. For the reasons set forth below, Defendant's motion is GRANTED.

**I.   Facts**

Plaintiff began working for Defendant in February of 1980. (Plaintiff Dep. 14:11-13, March 12, 2012.) Plaintiff was hired as a Staff Nurse and remained in that position for ten years before being promoted to Assistant Clinical Manager ("ACM") in 1990. (Id. at 14:14-22.) In May 1995, Plaintiff stepped down as an ACM to become a staff nurse in the Emergency Department. (Id. 33:24-34:15.) Plaintiff worked in the emergency department as a staff nurse until April 2010, when she was terminated for violating a major hospital rule.

    **A.  1995 to 2008**

In September 1999, Plaintiff received a verbal counseling because of her "refusal to push stretchers to x-ray and her 'slow' care to patients since her return from medical leave . . . [Plaintiff] stated she was just 'being careful' so she wouldn't be hurt again. [The Nurse Manager] stressed she needed to be safe but still needed to process patients in a timely manner." (Def. Mot. Summ. J. Ex. 7.)

In Plaintiff's 2002 performance appraisal, Plaintiff is commended as an experienced nurse with the ER who interacts well with management and ancillary staff. The report indicates that Plaintiff "needs to continue to work on speed and management of multiple patients. Needs to be more tolerant of visitors in the ER." And her achievement goals were to continue to support quality improvement and the "Service First!!" program. (Def. Mot. Summ. J. Ex. 8.) Plaintiff refused to sign this evaluation. (Id.

In Plaintiff's 2003 performance appraisal, Plaintiff is noted to be "highly experienced," neat and organized, excellent knowledge of job duties, and "treats patients with respect." (Def. Mot. Summ. J. Ex. 9.) The appraisal also indicates that Plaintiff needed to "be attentive to patient needs" and work on "time management with assignments and assisting others." (Id.)

On March 25, 2004, a patient's daughter wrote a letter to the emergency room nurse manager complaining of the poor treatment her mother received by Plaintiff. (Def. Mot. Summ. J. Ex. 6.) The letter states that Plaintiff was not helpful with informing the patient's family of her condition, would not help the patient change into her gown, had no concern that the patient was shivering cold and did not give her more blankets, and was too busy to empty the patient's puke pan. (Id.) The letter ends with, "I will not have any of my family members to ever be brought back into that hospital for 'help.' It was a very negative

environment and really needs to be brought to someone's attention." (Id.) Plaintiff denies these allegations, stating that she would never speak to a patient this way or leave a patient shivering and laying in vomit. (Pl. Dep. 61:14-25). She has no recollection that she was ever disciplined for this incident. (Id. at 62:1-3.)

Plaintiff's 2005 Performance Assessment indicates that Plaintiff has had customer complaints this year, needs to communicate with care and empathy, needs to be sensitive to customer needs, needs to work on presenting a more caring attitude, and needs to provide a shorter turn-around time for patients, treatments, test, discharges, and admits. (Def. Mot. Summ. J. Ex. 10.) It also states that Plaintiff is friendly to other team members, has a strong knowledge base, and takes good care of her patients. (Id.)

Plaintiff's 2006 Performance Assessment indicates that Plaintiff needs to be proactive and timely with patient care to facilitate patient flow and decreased length of stay and that Plaintiff needs to use professional verbal and nonverbal communication in patient treatment areas. (Def. Mot. Summ. J. Ex. 11.) Patient is also noted as having excellent documentation, strong clinical skills, excellent skills to deliver quality care to patients of all ages, and being a good resource for new employees and students. (Id.)

Plaintiff's 2007 Performance Assessment indicates that Plaintiff "needs to treat all customers with dignity and respect, customer complaints need to decrease." (Def. Mot. Summ. J. Ex. 12.) The supervisor comments state that Plaintiff "has the ability to provide excellent care and treat customers with dignity and respect and to also help promote throughput in the emergency department." (Id.)

**B. 2008 to 2010**

John Cargill started working for Defendant in January 2008 as the clinical manager of the emergency department. (John Cargill Dep. 5:20-24, April 24, 2012.)

On February 12, 2008, Plaintiff received counseling based on a patient complaint. (Def. Mot. Summ. J. Ex. 14.) The corrective action form indicates that on January 30, 2008, the mother of a 15-year-old patient complained that during discharge, her child was in increasing pain and asked for medication and Plaintiff responded, "No, she can't have anything because I will have to do the paperwork again." Plaintiff denies making the remarks and states that she has "never talked to a patient in such a way." (Id.) The attached outline of the counseling discussion states, "Discussion with ACMs provided feedback that [Plaintiff] has been mentioned regularly in patient complaints, indicating a trend of unprofessional communication."

On October 9, 2008, in response to a survey, a patient wrote "[Plaintiff], a nurse, has the worst bedside manners I have ever experienced. She's rude, insensitive, and VERY slow." (Def. Mot. Summ. J. Ex. 16.) Plaintiff stated that she had no idea why this patient made those comments. (Id.) This incident resulted in Cargill submitting a corrective action form on November 4, 2008 and issuing Plaintiff her first written warning. (Id.)

On the same day as the first written warning, Cargill also issued a second written warning to Plaintiff for a different incident that occurred on October 19, 2008. (Def. Mot. Summ. J. Ex. 17.) According to the corrective action form, a patient came to the emergency department for methotrexate in order to terminate an ectopic pregnancy. The patient filed a complaint that Plaintiff told the patient "you know that essentially you are going to get a medication that will kill your baby." The patient stated that she would be haunted forever by Plaintiff saying that she was killing her baby and that she will never be

4

able to step foot in Defendant's ER again. (Id.) Plaintiff states that she did make the statement but that she was quoting a nurse from the second floor, that it was not directed to the patient, and she is very sorry that the patient overheard her. (Id.)

In Plaintiff's 2008 Performance Evaluation, the performance comments state that Plaintiff needs to be more sensitive and caring to the needs of patients and families, more respectful of patients and families, improve the speed of care delivery to increase turnaround, and her behaviors are not always that of a model employee. (Def. Mot. Summ. J. Ex. 18.) The supervisor comments state:

> Kathy, you are a strong intelligent nurse, however you had three written warnings this year, this is unacceptable. Also you need to increase your turnaround times and throughput as this will help not only in patient satisfaction, but your fellow team members. Continue to improve on restraint logs, secondary assessments and blood culture documentation. The patient complaints need to stop, and you need to be able to interact better with patients and families.

(Id.) Plaintiff commented: "I am not happy with my score – I believe that my patient care is as good as it can be. I work as a team and do not abuse ancillary staff. However, I will do my best to change these impressions in the coming year."

On July 30, 2009, Cargill had a meeting with Plaintiff about the fact that her secondary assessment information is entered late or not at all for assigned patients. (Def. Mot. Summ. J. Ex. 19.) The meeting notes indicate that despite several reminders and a clear standard for the department that secondary assessment information is to be completed within one hour of a patient being placed in a bed, Plaintiff continues to submit late or incomplete secondary assessment information. (Id.) The notes refer to a specific incident on July 20, 2009 where the nurse that replaced Plaintiff on shift change noted that

none of the five patients had a secondary assessment completed and all had been in beds for more than two hours. (Id.) Both Plaintiff and Cargill signed the meeting notes. (Id.) Cargill did not write up a formal corrective action or move forward in the disciplinary steps.

In Plaintiff's 2009 Performance Evaluation, the performance comments indicate that patients feel Plaintiff is not engaged in their care enough, she needs to work on her compassion for substance abuse patients, Plaintiff does not always do bedside report, does not take charge enough, and needs to work on discharge and admit throughput. (Def. Mot. Summ. J. Ex. 23.) Plaintiff's strengths are listed as strong clinical abilities and good knowledge base. (Id.)

On February 12, 2010, Plaintiff received a 3-day suspension based on four complaints on four different days in February; two incidents of non-CREDO care and two incidents of not facilitating patient flow. (Def. Mot. Summ. J. Ex. 20.) The corrective action form states:

> Previously counseled for patient reports of non-CREDO communication/comments. On 2-6 and 2-7 [patients] reported similar to M/S unit leaders during rounds. My interview of [patients] verified statements and RN identified. Also previously alleged by physicians, staff, and charge that [Plaintiff] delays turning over beds. Discussed with her. On 2-4-10 staff reported incident of a closed bed not offered for patient care (verified), and on 2-8-10 I received a patient complaint of delay in discharge for 30 minutes while [Plaintiff] checked weather etc. on the internet - patient could see screen.

(Id.) Plaintiff refused to sign the form. On February 18, 2010 Plaintiff filled out a "problem resolution form" proposing for the suspension to be removed from her record and payment for the three days she was suspended. (Def. Mot. Summ. J. Ex. 21.)

On March 16, 2010, Plaintiff and Cargill signed a written statement of their understanding that Plaintiff accepted the suspension penalty, would not be compensated for the 3-day suspension, and if she met performance expectations, on September 1, 2010, the suspension would be revoked and revised to step 2, the first written warning step, of the progressive disciplinary process. (Id.)

### C. Incident Leading to Plaintiff's Termination

On April 12, 2010, Plaintiff's employment was terminated because of events that occurred on March 25, 2010. Plaintiff testified that she was working in triage with another nurse and that she was working in the main room while the other nurse was working in the other room. (Pl. Dep. 122:24-123:23.) Plaintiff could not see whether there were patients in the other room. (Id. at 123:24-124:1.) Plaintiff recalls that on March 25, 2010, a patient came in complaining of chest pains. (Id. at 124:14-16.) Plaintiff was at the computer when the patient came in and the patient told the admitting clerk that she did not want to be in the ER and get all the tests and had wanted to go to her doctor's office instead. (Id. at 124:21-125:1.) After the patient filled out some forms and talked about wanting to be at her doctor's office instead, the clerk enters the patient's information in the computer and that is the time entered as admitted to the emergency department. (Id. at 131:3-23.)

Plaintiff guesses that the patient was in her sixties. (Id. at 125:11.) Plaintiff asked the EMT on duty, Sheri Schmidt, to give the patient an EKG because no one else was in the triage room and Sheri was not busy. (Id. at 125:15-21.) Plaintiff did not do the EKG herself because the triage area would have been left without anyone there and the other triage nurse was in the other room and from that room could not see who comes into the waiting room. (Id. at 125:25-126:17.) When asked why she could not have brought the

7

patient to the other triage room to administer the EKG, Plaintiff testified, "There was supposed to be a person out there at all times. That's what I was told. Someone was supposed to be in the triage room at all times so they could see who was coming in the door . . . [unless] it were an emergency." (Id. at 129:6-12.)

Plaintiff stated that Sheri, the EMT, was available and that if she had not been there, Plaintiff would have gone with the patient and done the EKG. (Id. at 129:23-130:2.) Plaintiff states that she asked Sheri what she was doing and that Sheri told her she would be done in a minute and was bringing a patient food. (Id. at 131:1-2.) Plaintiff estimates that she dropped the patient off with Sheri within six to seven minutes after the patient had been admitted and received in triage. (Id. at 133:25-134:11.) The patient did not receive the EKG until 22 minutes after she was admitted to the emergency department.

The records indicate that the patient was not triaged until eleven minutes after her arrival and that she did not receive an EKG for another 18 minutes after that. (Def. Mot. Summ. J. Ex. 24.) Plaintiff admits that it is the best practice for an EKG to be done in ten minutes or less from when a patient arrives in the emergency department. (Pl. Dep. 138:17-20.) Plaintiff testified that if it were an emergency, she could have and would have done the EKG. (Id. at 139:12-16.) Plaintiff determined that it was not an emergency "because the woman said she had been having chest pain all day. She stood up at the window and talked. Vital signs were normal." (Id. at 139:19-22.)

The EMT paramedic, Sheri Schmidt, filed a complaint through Defendant's computer system, stating:

> Triage RN came to find me while I was attending to another [patient] to tell me to do an EKG on the noted [patient] who came to ER with a complaint of chest pain. Per witness RN, RN first looked around moderate room for

8

> someone else to do the EKG before coming to find me. When asked by the EKG was not done by her, RN stated that she was alone in triage. Spoke to charge RN that confirmed that there was 2 nurses in triage at that time. Because of this, EKG was not completed until [patient] had been in ER for 22 minutes. Only 2 patients in pending at that time (one for leg spasms and one for a boil). No patients in waiting list.

(Def. Mot. Summ. J. Ex. 24.) On April 12, 2010, Plaintiff received a corrective action form, terminating her employment. The form indicates that Cargill discussed this action with supervisors, "K. Cronin, B. James, D. Hartley" and the form is signed by Cargill, the Director, and the ER/LR Director. (Id.) The incident description indicates that Plaintiff:

> Failed to perform timely EKG as defined by policy. Waited to ask paramedic to do EKG. Best practice for EKG to be done in 10 minutes or less. Patient not triaged until 11 minutes after arrival. Not performing EKG at time of triage and waiting to ask for paramedic to perform added 18 minutes for total time from arrival of 29 minutes. [Plaintiff] was second nurse at triage and was able to do EKG if she chose to. She stated to staff that she was alone at triage.

(Id.) The corrective action form indicates that Plaintiff violated rule 117, which states, "Failure to fulfill the responsibilities of the job to an extent that might reasonably or does cause injury to a patient, visitor, or another employee." (Id.)

Plaintiff appealed her termination to Diane Hartley and then Bob James, both of whom denied her request. (Pl. Dep. 144:9-25.) Diane Hartley's denial stated, "Following our conversation on April 26th, 2010 and a review of your written counselings, I concur with the action taken of termination and do not believe transfer to another department is in the best interest of our patients." (Pl. Dep. 145:24-5.)

After Plaintiff was terminated, her job was filled by a 29-year-old nurse.

**D.    Hospital Policy**

9

According to Defendant's Human Resources Policy and Procedures, there are five steps of documented corrective action for minor infractions: (1) counseling, (2) first written warning, (3) second written warning, (4) 3 or 5 day suspension, and (5) termination. (Def. Mot. Summ. J. Ex. 15.) "Unacceptable job performance, including failure to follow policy, or failure to perform in a courteous, conscientious and caring manner in responding to the needs of patients, visitors, and fellow employees" is a violation of minor work rules. (Id.)

If the infraction is major, the corrective action may begin with step 4 or may result in immediate termination. "Failure to fulfill the responsibilities of the job to an extent that might reasonably or does cause injury to a patient, visitor, or another employee" is a violation of major work rules. (Id.)

Defendant has a policy in place when a position opens in the emergency department for on days or afternoons, the position is filled based upon seniority. (Cargill Dep. 106:12-21.)

### E. Discrimination Allegations

Plaintiff testified that she believes that John Cargill discriminated against her. Plaintiff testified in her deposition:

> Q. What is it that he did to discriminate you, in your opinion, or discriminate against you?
> A. Frequent references to my being the senior staff.
> Q. Anything else?
> A. Implying it would be hard to get a job at my age somewhere else.
> Q. Anything else?
> A. And alleging that I was slow.
> * * *
>
> Q. . . . Is there anything else that he did to discriminate against you based on your age or any other reason?

> A. My raspy voice was brought up a few times.
> Q. Anything else?
> A. Not that I can think of right now.

(Pl. Dep. 37:5-38:18.)

When asked about the context of these statements, Plaintiff testified that Cargill brought up her voice in a conversation about how patients perceive her and that Cargill said that patients perceive her as gruff because of her raspy voice. (Pl. Dep. 38:24-29:18.) Plaintiff also stated that Cargill referred to her as senior staff. She testified:

> A. Something was said about me being older, older staff, or senior staff.
> Q. Okay. But you don't recall specifically what
> A. No, I don't.
> Q. Is there anything else you can recall regarding your allegation that he made frequent references to you being senior staff or to you having a raspy voice?
> A. Not right now, no, I can't recall.

(Pl. Dep. 39:23-40:5.) Cargill testified that he does use the term "senior staffer," but that he uses it as a term of experience, not age. He testified:

> Q. Do you use or have you used the term, "senior staffer."
> A. Within the emergency department I think the highest level, 11 years of service in that emergency department is 38 years, down to months. Senior staff are staff that have been in the department -- I'm going to pick a term -- four or more years. They know how to run the department. They've shown their quality in the department. They understand the policies, and process and history of the department. So senior staff refers to their status in the department as an experienced nurse in that department able to give the care. Junior staff are new hires, orientees, you know, regardless of age. They're juniors.
> Q. Well, and that was going to be my next question. Would you refer to a 60 year old employee who has been employed in the department for one to two years, a junior staffer or a senior staffer.
> A. In my mind, that's a junior staffer.

(Cargill Dep. 102:9-25.)

Plaintiff also testified that:

11

> Q. Okay. And you also said that he would imply that it would be hard for you to get a job somewhere else at your age. What did he say with respect to this implication?
> A. I mean I can't quote but it was just what I said.
> Q. Well, the reason I am asking is because you said that he implied. So I am wondering what it was said, even if you can' t recall the exact words.
> A. Well, he said it would be hard for me to get a job at my age anywhere else.
> Q. Do you recall the context of this statement?
> A. I don't recall the exact – we were talking. I don't know. No, I don't.
> Q. Okay.
> A. I'm not going to speculate.
> Q. Do you recall that it was a conversation regarding your performance and the need to improve your performance in order to remain employed?
> A. Yes, it might -- yes.

(Pl. Dep. 40:2-24.)

When asked what Cargill said about Plaintiff being slow, she states, "Let's see. What's that cute little word they use? I didn't facilitate throughput." (Pl. Dep. 43:3-8.) Cargill told Plaintiff that she did not facilitate throughput fast enough several times and that Doctor Harling also stated the same thing to her. (Id. at 43:23-44:16.)

Although Plaintiff felt that Cargill discriminated against her, she never considered going to talk to human resources or filing a complaint. (Pl. Dep. 115:6-11.) When asked if she was aware that Defendant had a policy against harassment and discrimination, Plaintiff stated, "I'm sure every business does." (Id. at 115:13.)

**II.    Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised

Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

13

### III. Analysis

Plaintiff alleges that Defendant violated the Age Discrimination in Employment Act and Michigan's Elliott-Larsen Civil Rights Act by firing her because of her age. Under the ADEA, it is unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or] (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of an individual's age[.]

29 U.S.C. § 623(a). "The first clause [proscribes] intentional disparate treatment on the basis of age, while the second clause [proscribes] facially neutral employment practices with a disparate impact based on age." *Aldridge v. City of Memphis*, 404 F. App'x 29, 40 (6th Cir. 2010) (citations omitted).[1] Here, Plaintiff alleges a disparate treatment claim.

A plaintiff can prove an ADEA disparate treatment violation with direct or circumstantial evidence. *Aldridge*, 404 F. App'x at 40 (citation omitted). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Bhama v. Mercy Mem'l Hosp. Corp.*, No. 09-2193, 2011 WL 1086632, at *9 (6th Cir. Mar. 25, 2011) quoting *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006). Direct evidence "does not require the fact finder to draw any inferences to reach that conclusion." *Id.* A "facially discriminatory employment

---

[1]The ELCRA prohibits "discriminating' against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age[.]" Mich. Comp. Laws § 37.2202(1)(a). The Sixth Circuit analyzes ELCRA claims under the same standards as federal ADEA claims. *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009). Plaintiff's age discrimination ELCRA claim therefore rises and falls with her ADEA claim.

14

policy or a corporate decision maker's express statement of a desire to remove employees in the protected group" are examples of direct evidence. *Aldridge*, 404 F. App'x at 40 (citation omitted). But when the motivating factor behind an employee's termination is "some feature other than the employee's age," no disparate treatment claim under the ADEA exists. *Id.*

An age discrimination claim based on circumstantial evidence uses the burden shifting structure set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). A plaintiff must first "set forth a *prima facie* case of age discrimination." *Geiger v. Tower Auto.*, 579 F.3d 614, 622-23 (6th Cir. 2009). To do so, a plaintiff must show: "1) that she was at least 40 years old at the time of the alleged discrimination; 2) that she suffered an adverse employment action; 3) that she was qualified for the position held; and 4) that she was replaced by someone younger." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). "If a plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate a non-discriminatory reason for its adverse employment action." *Id.* (citation omitted). If the defendant articulates a reason, then the plaintiff must demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for age discrimination. *Id.* A plaintiff can establish pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate her discharge." *Tuttle*, 474 F.3d at 319.

In this case, Plaintiff attempts to show discriminatory animus on the part of decision-maker John Cargill. Plaintiff alleges that Cargill made frequent references to her age,

referred to her as "senior staff," implied that she wouldn't be able to get a job at her age, and told her that her voice was raspy.

As Plaintiff's deposition testimony shows, Cargill made the reference to Plaintiff's raspy voice as the reason that patients might perceive her as gruff. To the best of Plaintiff's recollection, this conversation could have taken place when Cargill was counseling her on the patient complaints she received. The comment that it may be hard for her to find another job, Plaintiff attempted to recall, and she also thought it was made in the context of counseling her about the complaints and corrective actions and in an effort to get Plaintiff to improve her performance so she could *remain* employed by Defendant.

Plaintiff also asserts that Cargill's reference to her as "senior staff" was discriminatory. She cannot remember the context in which it was used or any specifics about it, other than Cargill using the term to refer to her. Cargill testified, however, that he uses the term "senior staffer" to mean someone experienced, who has been in the department for four or more years, regardless of their age. Plaintiff has offered nothing to refute Cargill's statement that he uses the term, intending it to have that meaning.

Before Cargill was hired as the Clinical Manager of the Emergency Department, Plaintiff's performance evaluations indicate that she had a history of patient complaints, lack of bedside manner, and problems with throughput. Plaintiff has not presented a facially discriminatory employment policy or a corporate decisionmaker's express statement of a desire to remove employees in the protected group. The statements she presented do not show any direct evidence of discrimination or discriminatory bias.

Plaintiff has not shown that Defendant's non-discriminatory reason for terminating her was pretext for discrimination. A plaintiff can establish pretext by showing "(1) that the

16

proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate her discharge." *Tuttle*, 474 F.3d at 319.

First, Plaintiff does not show that the proffered reason for her termination–the violation of a major work rule–had no basis in fact. She admits that she asked the EMT to perform the EKG, was not busy with a patient at the time, but did not perform the EKG herself. She also states that she could have performed the EKG if it had been an emergency, but she determined it was not. Diane Morris, another staff nurse for Defendant testified, however, that there should be no reason that a patient coming in complaining of chest pain should not have an EKG within ten minutes of arriving at the ER, as provided in the hospital protocols, "unless they're not breathing or if there's a cardiac arrest situation coming on." (Morris Dep. 31:8-9) Neither of those situations applied in this case.

Second, the Court finds Defendant's reasons for terminating Plaintiff reasonable. Defendant has offered the reasoning that Plaintiff violated a major work rule that could have resulted in injury to a patient and that she had a number of patient complaints and a disciplinary history that warranted her dismissal. There is no evidence that this proffered reason did not actually motivate Plaintiff's discharge. Plaintiff appealed her termination to two supervisors higher up than Cargill, Diane Hartley and Bob James. Both Hartley and James denied Plaintiff's request to have her termination set aside and Hartley specifically stated, "I concur with the action taken of termination and do not believe transfer to another department is in the best interest of our patients."

Finally, the Court finds that the reasons offered by Defendant were sufficient to motivate Plaintiff's discharge. According to hospital policy, if the infraction is major, the

17

corrective action may begin with step 4 or may result in immediate termination. Plaintiff's infraction, "Failure to fulfill the responsibilities of the job to an extent that might reasonably or does cause injury to a patient, visitor, or another employee" is a violation of major work rules. This alone was sufficient to warrant termination. Moreover, Plaintiff had already reached step 4, suspension, with a series of minor infractions. Defendant and Cargill had sufficient reason to terminate Plaintiff.

Because Plaintiff has not created a material issue of fact as to pretext, her age discrimination claims fail.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

So ordered.

                           s/Nancy G. Edmunds
                           Nancy G. Edmunds
                           United States District Judge

Dated: October 9, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 9, 2012, by electronic and/or ordinary mail.

                           s/Carol A. Hemeyer
                           Case Manager